**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEPHEN MONTGOMERY, | ) |
| | ) |
| Petitioner, | ) |
| | ) Civil Action No. 10-448 |
| v. | ) Judge Cathy Bissoon |
| | ) |
| STEPHEN A. ZAPPALA, JR., *et al.*, | ) |
| | ) |
| Respondents. | ) |

**MEMORANDUM ORDER**

Stephen Montgomery ("Petitioner") filed this Petition for Writ of Habeas Corpus on

April 5, 2010.  (Doc. 1).  Pursuant to 28 U.S.C. § 2254, Petitioner challenges his 2002

convictions in the Court of Common Pleas of Allegheny County, Pennsylvania, for first degree

murder, 18 Pa. Cons. Stat. § 2501, aggravated assault, 18 Pa. Cons. Stat. § 2702(a)(1), criminal

conspiracy, 18 Pa. Cons. Stat. § 903, and violations of Pennsylvania's Uniform Firearms Act, 18

Pa. Cons. Stat. § 6106.[1]  (Doc. 10-2 at 28-29; Doc. 1 at 1).  For the reasons stated below, this

petition will be denied.


**I.  The Crime and the Trial**

The facts presented at Petitioner's criminal trial were summarized by the Court of

Common Pleas as follows:

---

[1] Plaintiff currently is serving sentences of (1) life imprisonment without the possibility of parole for his murder conviction; (2) 10-20 years' imprisonment for the aggravated assault conviction, running concurrently with his life sentence; (3) 10-20 years' imprisonment for the criminal conspiracy conviction, running consecutively to the sentence for the aggravated assault conviction, and concurrently with his life sentence; and (4) three-and-one-half to seven years for his firearms violations, running consecutively to his criminal conspiracy sentence, and concurrently with his murder sentence.  See Sentencing Hr'g Tr. at 8-9.

The charges arise out of the shooting death of George Maxwell that occurred on November 4, 2000, in the city of McKeesport.  According to the Commonwealth's witnesses, [Petitioner] beat the victim and then shot him in the head outside an after-hours club located on Walnut Street in McKeesport.  [Co-defendant Trent Thompson ("Thompson")] was also seen kicking the victim prior to the shooting.  James Carter described himself as the victim's best friend.  He said that he was with the victim outside the after-hours club [on the night of the shooting].  A person [Carter] identified as Kijafi Fuqua was standing on the hood of a white Pontiac Bonneville, jumping up and down.  [Carter] saw the victim walk towards Fuqua and the white Bonneville.  He then saw the [Petitioner] come out of the bar and walk towards Fuqua.  [Petitioner] had a gun in his hand.  [Carter] then saw the victim approach [Petitioner].  After a brief conversation, [Carter] saw the victim raise his hands defensively and [saw Petitioner] strike him in the head with the gun.  After the victim fell to the ground, [Petitioner] struck him several more times.  [Carter] then saw [Thompson] exit a vehicle, approach the victim and kick him repeatedly.  [Petitioner] then picked up the gun he had dropped, pointed it at the victim and shot him in the head.

(Doc. 10-3 at 33).

During the trial, the Commonwealth called Fuqua to the stand.  Oct. 23, 2002 Trial Tr. at 33.  Fuqua testified, on the night of the homicide – although apparently after it occurred – he was in his car with his girlfriend.  While they were stopped at an intersection, he observed a white car behind them that "seemed kind of close."  He exited his car, presumably to confront the driver of the white car, but ran back into his own car after someone in the white car drew a gun on him.  Id. at 43-45.  He claimed not to have seen the individual with the gun.  Id. at 45; 48.

The prosecution impeached Fuqua with a police report regarding a statement that he had made shortly after the murder.  Id. at 45.  The report indicated that Fuqua had described the car behind him that night as a red Mustang 5.0 convertible[2] and contained a physical description that Fuqua had provided of the individual with the gun.  Id. at 46-47.

---

[2] The Commonwealth provided evidence that Petitioner's co-defendant had access to such a vehicle.  See Oct. 23, 2002 Trial Tr. at 160.

Fuqua responded that the police officers who were interviewing him had provided him with this information, and that he merely had told them what they wanted to hear.  Id. at 51-52. Fuqua additionally accused the police officers of threatening him.  Id. at 62.  When confronted with evidence that he had identified Petitioner in a photo array, Fuqua testified that he had not chosen Petitioner's photo, but that of a different individual.  Id. at 53.

The prosecution apparently had been forewarned that Fuqua's testimony was not going to support its case.  See Oct. 21, 2002 Trial Tr. at 31-32.  As such, it next called Detective Yingling to present testimony concerning Fuqua's prior statement, his identification of Petitioner, and his demeanor when asked to provide a taped statement.  Concerned about the possible use of this testimony as substantive evidence of Petitioner's guilt – as well as the prosecution's apparent tactic of using Fuqua as an evidentiary strawman in order to secure the admission of his prior statement – the trial judge conducted a lengthy, strongly-worded discussion with counsel at sidebar.  At the end of the sidebar, the judge restricted the scope of Yingling's testimony, and provided a cautionary instruction to the jury that it was not to consider Yingling's testimony for any reason other than whether or not Fuqua's testimony was true.  Id. at 92-93.  The prosecution additionally called Detective Kelly, who provided further testimony regarding Fuqua's prior statement to police.  Id. at 149-50.


## II.  The Claims

Petitioner raises the following claims for relief:

1.  The state court erred in allowing the Commonwealth the present inconsistent testimony from Fuqua at Petitioner's criminal trial.  (Doc. 1 at 5).  Specifically, Petitioner claims

that this testimony was elicited to have Fuqua's statements considered as substantive evidence by the jury, and asserts that those statements as irrelevant. Petitioner characterizes this as a deprivation of his rights under the Fifth and Fourteenth Amendments to the Constitution of the United States, as well as violations of Federal Rules of Evidence 403 and 607. Id.

       2. Trial counsel was ineffective when he failed to present alibi witnesses at trial. Id. at 7.


## III. Procedural Issues

Before this Court can address the merits of Petitioner's claims, it will briefly address whether this petition fulfills the applicable procedural requirements, as set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Respondents concede that all of Petitioner's claims are timely and, as a result, they will be treated as such. (Doc. 10 at 18). Additionally, Respondents concede that Petitioner's second claim – in which he alleges ineffective assistance of trial counsel – was properly exhausted before the state courts. (Doc. 10 at 21). However, they argue that his other claim is procedurally defaulted due to Petitioner's failure to raise it as a federal claim in the state courts. Id.

Rather than engage in a detailed analysis of whether these claims were indeed presented as federal law claims in the courts of Pennsylvania, this Court will presume, without deciding that they were exhausted, and proceed directly to their merits. See 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

## IV.  MERITS

### A.  Standard of Review under Section 2254

28 U.S.C. § 2254 allows a person in custody due to the judgment of a state court to seek a writ of habeas corpus based "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  See 28 U.S.C. § 2254(a).   Amended section 2254 of the federal habeas corpus statute provides the standard for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

It is important to note that this standard is different from finding that the state court applied clearly established federal law *incorrectly*.  "The unreasonable application test is an objective one – a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Lambert v. Beard, 633 F.3d 126, 133 (3d Cir. 2011) (quoting Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005)).  Instead, the

application of the law by the state court must also be *unreasonable*.  Lambert, 633 F.3d at 133.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as

'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington

v. Richter, 562 U.S. ----, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S.

652, 664 (2004)).

Moreover, a federal court must accord a presumption of correctness to a state court's

factual findings, which a petitioner can rebut only by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).  If a state trial court and appellate court make conflicting factual

findings, the habeas court must defer to the findings of the higher court – regardless of the

propriety of those findings under state law – unless they are rebutted by clear and convincing

evidence.  See Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006).  Petitioner's claims will be

reviewed in accordance with these standards.

**B.  Application of the Merits Standard**

**1.  Claim 1: Fuqua's Testimony**

Claim 1 relates to evidentiary rulings made at Petitioner's criminal trial.  Specifically, it

is based on the ruling of the trial court that allowed the admission of evidence of Fuqua's prior

statements to police that were inconsistent with his trial testimony.  See (Doc. 1 at 5).  Petitioner

asserts that these statements were submitted as substantive evidence.  Id.  Additionally, Petitioner

attacks the trial court's allowance of Fuqua's testimony in the first place, characterizing it as

irrelevant.  Id.

Habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Taylor v. Horn, 504 F.3d 416, 448 (3d Cir. 2007); Smith v. Horn, 120 F.3d 400, 426 (3d Cir. 1997). Petitioner may obtain habeas review only of federal constitutional claims.  28 U.S.C. § 2254(a). Claims of state court error in interpreting or applying state evidentiary rules are not cognizable here.  See Wells v. Petsock, 941 F.2d 253, 256 (3d Cir. 1991) ("We can take no cognizance of non-constitutional harm to the defendant flowing from a state's violation of its own procedural rule, even if that rule is intended as a guide to implicate a federal constitutional guarantee."); Bisaccia v. Att'y Gen. of New Jersey, 623 F.2d 307, 312 (3d Cir. 1980) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1974)).  To the extent that Petitioner attempts to contort these state-law evidentiary rulings into purported violations of his constitutional rights, this Court will presume, without deciding, that such arguments were exhausted before the state courts.  As it is clear from the record that the state courts did not address his claims as arising from the Constitution of the United States, this Court will apply *de novo* review.

The Court of Appeals for the Third Circuit has held that "evidentiary errors of state courts are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial." Bisaccia, 623 F.2d at 312.  The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."  Crane v. Kentucky, 476 U.S. 683, 689 (1986).  That said, state evidentiary rules cannot be inflexibly applied in such a way as to violate fundamental fairness.  See Chambers v. Mississippi, 410 U.S. 284, 299-302 (1973).  With respect to erroneously admitted evidence

> To constitute the requisite denial of fundamental fairness sufficient
> to issue a writ of habeas corpus, the erroneously admitted evidence
> must be material in the sense of a crucial, critical, highly
> significant factor, and the probative value of the evidence must be
> so conspicuously outweighed by its inflammatory content that a
> defendant's constitutional right to a fair trial has been violated.

Peterkin v. Horn, 176 F. Supp. 2d 342, 364 (E.D. Pa. 2001).

The prosecution's apparent gamesmanship notwithstanding, a review of the record regarding Fuqua's, Yingling's and Kelly's testimony does not come close to meeting this standard – there is nothing "inflammatory" in the testimony, and the evidentiary rulings appear to conform to state law.  Additionally, the trial court provided an instruction to the jury that it could not consider Detective Yingling's testimony regarding Fuqua's prior statement as substantive evidence, see Oct. 23, 2002 Trial Tr. at 92-93, and reiterated this instruction with respect to both detectives during the prosecution's closing arguments.  Oct. 24, 2002 Trial Tr. at 55, 95-96, 115.  A jury is presumed to have followed a judge's instructions.  See Richardson v. Marsh, 481 U.S. 200, 211 (1987) (discussing this presumption in the context of an alleged violation of the Confrontation Clause).  As such, despite Petitioner's attempt to cloak this claim in constitutional significance, it is clear that he actually complains of an issue of state law, which is not cognizable under habeas.  Accordingly, this claim must be denied.

### 2. Claim 2: Ineffective Assistance of Counsel

Petitioner next claims that his trial counsel was ineffective for failing to call Tenicka Thompson as an alibi witness.[3] (Doc. 1 at 7). At Petitioner's PCRA hearing, Tenicka Thompson testified that Petitioner had been with her at her apartment during the time of the murder. Apr. 21, 2008 PCRA Hr'g Tr. at 11-12. Specifically, the night of the murder also happened to be her 19th birthday. Tenicka Thompson had a get-together for family and friends, at which she consumed about three 12-ounce cans of beer. She alleges that Petitioner arrived at her home at about 12:30 a.m. – after everyone else had left – and spent the night with her. Id. at 12-14. She asserts that she provided this information to Petitioner's trial counsel, and that he said that he would contact her if her testimony were needed. Id. at 10. It is undisputed by the parties that this claim was exhausted in the state courts – therefore, AEDPA's deferential standard of review applies.

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: (1) counsel's performance was unreasonable; and (2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. Id. at 690.

---

[3] Tenicka Thompson should not be confused with Trent Thompson, Petitioner's co-defendant at trial.

The first prong of the <u>Strickland</u> test requires a petitioner to establish that his or her attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  <u>Id.</u> at 688.  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy."  <u>Id.</u> at 689.  The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place.  <u>Id.</u>

The second prong requires a petitioner to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable.  <u>Id.</u>  To prove prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  <u>Id.</u> at 694.  A "reasonable probability" is one that is sufficient to undermine confidence in the outcome.  <u>Id.</u>

The PCRA trial held an evidentiary hearing on this issue on April 21, 2008, at which both trial counsel and Tenicka Thompson testified.  Based on Tenicka Thompson's testimony and demeanor at the hearing, the PCRA trial court found that she was not a credible witness, and thus trial counsel was not ineffective for failing to call her.  (Doc. 11-2 at 44-45).  The Superior Court provided a more thorough analysis of Tenicka Thompson's testimony, finding that "the nature and quality of Ms. Thompson's testimony was not such that there is a reasonable probability that the jury would have credited it and render a more favorable verdict."  (Doc. 11-8 at 7-8).  Moreover, the Superior Court explicitly held that trial counsel's failure to call her did not result

in prejudice to Petitioner.  Id. at 8.  A review of the record provides no basis to refute either of those determinations – especially in light of AEDPA's high standard.  Accordingly this claim also must be denied.

## V.  Certificate of Appealability

A certificate of appealability will be denied, as Petitioner has failed to make "a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2).

AND NOW, this 12th day of June, 2013, after careful consideration of the submissions of the parties and the record, and for the reasons set forth above, it is hereby ORDERED and DIRECTED that the instant Petition for Writ of Habeas Corpus is DENIED.

IT IS FURTHER ORDERED that a certificate of appealability is DENIED.

Dated:  June 12, 2013                          BY THE COURT:

                                               s/Cathy Bissoon
                                               CATHY BISSOON
                                               UNITED STATES DISTRICT JUDGE

cc:
**STEPHEN MONTGOMERY**
FF-8914
SCI Pittsburgh
PO Box 99991
Pittsburgh, PA 15233

Counsel of record (via CM/ECF)